[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
CT Page 10069
The parties to the contract action are the plaintiff A. Prete Son Construction Co., Inc. ("Prete") and the defendant town of Madison ("Town").
The complaint is in four counts and has its basis in a written contract, dated June 19, 1987 between Prete and the Town. That contract was one under which Prete was to be paid $1,530,531.00 by the Town for performing certain additions, alterations and construction at the Daniel Hand High School ("Hand") in Madison. The first count alleges that the Town has failed and refused to pay to Prete the balance due and owing it in the amount of $125,706.55 although it has performed the services and provided the materials as agreed upon. This sum is specifically claimed to be due and owing for the services and materials in installing a new gymnasium floor by Prete at Hand. Prete seeks money damages under the first count for the alleged breach.
The second count sounds in unjust enrichment. It refers to the first count and goes on to allege in addition that Prete provided materials and services in good faith expecting to be paid by the Town. However, the Town, it is alleged, although wilfully availing itself of such materials and services, has retained and enjoyed the such benefits without payment and has, therefore, been unjustly enriched. Accordingly, because the Town, at all times, knew or reasonably should have known that Prete expected to be paid, the Town is required in equity to compensate it plus a reasonable allowance for profit.
Going on, the third count alleges that on or before June 19, 1987, Prete was engaged by the Town to perform certain alterations, renovations and construction at Hand and that it did so in good faith expecting to be paid by the Town. Again, alleging that the Town had wilfully availed itself of the plaintiff's services and materials for which it has refused to pay Prete $125,706.55 the alleged reasonable value of such services and materials, the plaintiff seeks to recover the reasonable value of the same in the third count.
The fourth count which essentially alleges that the failure and refusal of the Town to pay Prete as claimed violated General Statutes §§ 42-110a et seq., i.e. Connecticut Unfair Trade Practice Act and seeks relief thereunder. This fourth count CUTPA claim was CT Page 10070 withdrawn in open court at the trial.
In answering the allegations of the complaint the Town, while admitting the execution of the written contract of June 19, 1987, essentially denies the remaining allegations. The Town, however, has setup three special defenses and has also interposed a counterclaim.
The first special defense maintains that the Town "has paid the plaintiff in full for all work and materials performed in accordance with the contract."
The second special defense alleges the following: "1. The plaintiff breached the contract with respect to the installation of the Daniel Hand High School gymnasium floor in that the floor failed to meet the quality standards specified within the contract documents; the floor failed to comply with the plans and specifications and general conditions; the floor was improperly installed; the workmanship of the plaintiff or its subcontractors was defective; 2. The aforesaid gymnasium floor was found to be unacceptable and was rejected and the plaintiff contractor was directed to correct it, but has failed and refused to do so; 3. As a consequence of the aforesaid, the Town has been required to replace the gymnasium floor; 4. As a consequence of the aforesaid, the Town has been required to hire a new flooring contractor at great expense, incur expenses for architectural services, consultant services and for labor and materials and attorney's fees and expenses for removal, storage and disposal of the defective flooring; 5. The cost and expenses incurred by the Town as a consequence of the breach of the contract by the plaintiff contractor exceed the sums claimed by the plaintiff in his Complaint."
The third special defense alleges the following: "The plaintiff breached the contract by failing to provide to the defendant warranties, guarantees, as-built plans and other documentation called for by the contract and the plaintiff, it subcontractors and suppliers have failed to honor any guarantees or warranties with respect to the Daniel Hand High School gymnasium floor." The plaintiff denies each special defense.
The defendant has interposed a counterclaim seeking money damages. That counterclaim which alleges the execution of the written contract of June 19, 1987 incorporates all the allegations of its second special defense and then adds these additional CT Page 10071 allegations: "8. As a result of the breaches of contract as aforesaid, the Town of Madison has refused to honor the contractor's application for payment in the amount of $125,706.55; 9. As a result of the breaches of the contract by the A. Prete 
Son Construction Co., Inc., the Town of Madison has suffered damages in excess of the aforesaid sum of $125,706.55 and the plaintiff contractor is indebted to the Town of Madison; 10. Although many times requested to do so, the plaintiff contractor A. Prete Son Construction Co., Inc. has neglected and refused to correct the defective floor as its own expense." Essentially, the plaintiff denies the allegations of the counterclaim. At the trial counsel stipulated that all the evidence adduced at the trial would apply to both the plaintiff's complaint and the defendant's counterclaim.
 I.
By way of broad background this complex case which was presented in an eighteen day trial at which about one hundred and seventy exhibits were introduced stems from a written contract between Prete and the Town of Madison dated June 19, 1987 which concerned the construction of an addition and alterations to the Hand High School including the installation of a gymnasium floor at that school. It is with the installation of that floor with which this case is basically concerned. The plans and specifications for this addition and alteration project, including the gym floor were drawn by Kosinski Construction Management Inc., a New Haven firm of architects, planners, engineers and construction. The Town had selected that firm for that purpose after the execution of a written contract in October 1985 between Kosinski Associates and the Town. Peter Kosinski, ("Kosinski") a practicing Connecticut architect since 1965, is a principal in Kosinski Associates.
At the time Prete was working at Hand that company was also under contract with the Town and working on additions and the like to the Jeffrey Elementary School in Madison ("Jeffrey School"). The Jeffrey School building was close by to the building housing the Hand High School. Prete's office trailer, during the Hand and Jeffrey schools jobs was on the premises in front of the gym entrance to Hand.
After the original floor subcontractor left the job, Prete retained the firm of A. Dion Son from Massachusetts in the Spring of 1987 as the new subcontractor to install the gym floor. The witness Donald Dion ("Dion") was a principal of A. Dion Son. In CT Page 10072 June 1988 when Prete and Dion agreed that Dion would install the floor at Hand, Prete gave Dion a copy of that portion of the General Conditions of the Contract for Construction which was entitled "Gym Wood Flooring" which was Section 09560 of that contract and contained the specifications for the gym floor. Prete also gave him a copy of the Kosinski blueprints of the Hand gym. Connor, the manufacturer of the flooring system Dion installed in the Hand gym also sent Dion a copy of a booklet (Exhibit G) giving specifications for the installation of the various flooring systems it made including the particular Connorloc system installed by Dion. The specifications for the floor by Kosinski and those in this Connor booklet are not all the same.
The gym floor involved was installed by Dion and his employees with the preparation for and actual installation, according to Exhibit I, being done over a period that extended from July 18, 1988 through August 5, 1988. The Dion installed floor which was a Connorloc Flooring System ("Connorloc") was a system permitted by the Kosinski plans and specifications. It was what was referred to at trial as a "clip and channel" system and the lumber and components of it such as foam, channels, clips, etc. were ordered by Dion from the manufacturer Connor Forest Industries ("Connor") through its flooring division, i.e. Connor Forest Industries. Dion was the party who ordered these materials from Connor and they arrived at Hand by truck on July 6, 1988 where they were unloaded by Dion and his employees. The wood for the gym floor was 27/32" in thickness and, upon unloading, Dion caused this floor lumber which was maple to be stacked in the gym in the Hand School building in stacks "maybe four feet high." The 27/32" thickness of the flooring lumber was that dimensional thickness required by the Kosinski specifications. This wood was not unbundled when stacked. There was around 13,000 square feet of gym floor which itself measured about one hundred three feet by one hundred twenty-five feet. Connor's invoice of the floor lumber consigned to Dion indicates that it contained, inter alia, 13,266 square feet of Maple Permalock flooring lumber. These maple flooring boards came "random length" with the longest being eight feet and the shortest being fourteen inches. After unloading the trailer and storing the wood and other materials in the gym Dion and/or his employees did not return to Hand until July 18, 1988 at which date he began work on the floor installation.
The Madison School/Town Hall Facilities Committee ("Building Committee") was the entity of the Town that represented and acted for the Town in this matter. Frederick Murphy Jr. ("Murphy") was CT Page 10073 the Chair of the Building Committee. There were a number of other members of that Committee including Kenneth Borst and Joseph Carrilli. Borst had retired from Yale where he had had some experience in construction. Carrilli was director of construction for the University of New Haven. No one on the Building Committee, however, was an expert on wood flooring. This committee ultimately retained the services of Richard Johannes ("Johannes") of New York City as its wood flooring expert and he testified at length at the trial. Murphy was the Chair of the Building Committee at all times involved in this except for a period in the Spring of 1990 when he was absent as the result of surgery. In his absence at that time Borst acted as vice chair.
In December 1987, prior to Dion's entrance into this matter, an agreement concerning James Miner had been executed between the Building Committee and Kosinski Construction Management Inc. acting by James Smith ("Smith"), as its general manager. This agreement (Exhibit M) involved the furnishing, to the Building Committee, of the services (at a charge of $1,000.00 for each forty hour week) of one James Miner, "to perform the duties and responsibilities of the `Owner's Project Representative'" at both the Hand School and Jeffrey School projects. This comprehensive agreement, in outlining Miner's duties, responsibilities and limitations on his authority, provided that he conduct on-site observations and "Report any defective work to both the owner and the architect" but also that he maintain certain records which provided in part that he "7.2 keep a daily diary or by book, recording hours on the site: weather conditions; daily activities; decisions; observations in general . . . . The log book is to be brought to Betsy Quilliam in the Town Hall every Monday (or the following Tuesday if Monday is a holiday) for her to copy and keep in the Committee's files." It also provided in a section captioned "Rejection of Work" the following: "If a situation arises during construction which in your [Miner's] view requires that work be rejected, report such situation immediately to the Owner and Architect."
Miner was acting as the owner's full time representative, pursuant to this agreement, at the times that Dion was installing the floor at Hand in the summer of 1988 and for a time thereafter. Miner was to inspect Dion's work as it was being performed. Miner, it was disclosed at the trial kept records but it was agreed that "any pertinent [records Miner kept] for the July — August 1988 time frame has disappeared." Miner also did not testify at the trial as he could not be located. CT Page 10074
Dion finished the actual installation of the Connorloc flooring system on August 18, 1988. During the installation he had made, as required by Connor, daily readings of the inside temperature and humidity as well as of the moisture content of the wood flooring that was installed and not installed. This "Daily Documentation" was made on forms provided by Connor and became Exhibit I at trial. Upon completion of the installation by the installer (Dion), he was required to send this documentation to Connor for their examination before Connor would issue its warranty to the owner, here the Town of Madison. The nature of the compliance by Dion here with not only with the Kosinski specifications as to temperature and humidity at the time of installation but also those of the Connor booklet was hotly contested at trial and in the post trial briefs. Connor did issue its warranty to the Town on September 1, 1988 for a five year period and it stated that it applied only to the maple flooring and not the installation. A. Dion Son signed a separate section of this Connor Warranty Form, the first sentence which states "This warranty is conditioned expressly upon Owner's compliance with all maintenance suggestions set forth in the Connor `Care Card' to be provided to Owner." The Connor "Care Card" became Exhibit K at trial.
In any event, the gym floor was turned over to the Town and ready for use on the Monday after Thanksgiving in 1988 at which time the floor looked "fine" according to Lawrence Ciotti, the Athletic Director at Hand. Parenthetically, we note that Ciotti said that the Hand gym is at all times relevant to this case was used not just for basketball but for volleyball, badminton and jogging (for both students and senior citizens). In inclement weather the gym is also used by teams for "outside" sports at Hand but there is strict enforcement, said Ciotti, of the use of objects such as cleats or helmets that could injure the gym floor. The gym is used for various school activities from 7:30 a.m. to 9:00 p.m. and on weekends for the Town Recreation Department program.
Thereafter, the Town, in the winter of 1989, sometime in late January 1989 during the first heating season, maintained that problems became evident with the Dion-installed floor which the Town contends became increasingly manifest with the passage of time. This demonstrated the Town claims, that the Dion floor had been improperly installed, that it failed to comply with the plans and specifications, that it failed to meet "quality standards", that the workmanship was defective and that Prete breached its warranties and guarantees. Over the period from about February CT Page 10075 1989, when some shrinkage or separation of boards was seen down to the institution of this litigation there was extended interaction between the parties concerning the possible resolution of what the defendants regarded as a floor installation by Prete through his subcontractor (Dion) that was in breach of Prete's contract with the Town. According to the Town, the kind and degree of the problems with the floor increased over time.
In brief form, the specifications called for the installation of the Connorloc flooring system manufactured by Connor which is a system of interlocking floor boards with a tongue and groove design which boards were secured by clips or pins in the boards to channels which channels in turn were fastened to the concrete slab below the flooring. The wooden boards were not nailed down but the purpose of the clip attachment to the channel was intended in effect, to secure the flooring. Between the underside of the 27/32" maple flooring was placed a polyethylene vapor barrier and a foam pad known as underlayment. The concrete slab had to be swept and otherwise prepared and had to be at the proper tolerance specified, i.e. 1/8 of an inch more or less in 10 feet so as to properly receive the channels, barrier foam pad and flooring above it. As already noted the plans and specifications for the gym flooring system set out in the contract between Prete and the Town were not exactly the same as those set out in the Connor recommendations (Exhibit G). The Town contended, inter alia, that the floor had been installed in the summer season at a time when Dion did not observe the specifications and quality standards especially those of temperature and humidity both in the architect's specifications and in the Connor Book (Exhibit G). It also maintained that the concrete slab upon which the flooring was laid had not been properly prepared as required, that the channels had not been properly installed, that the maple flooring was "too wet" when installed, that the installation was done when the work of the "wet trades" (such as painting and concrete) in the area of the gym had not been done. This claimed improper installation and/or the contended defective workmanship resulted, it is claimed inter alia, in the shrinking or separation of boards in the flooring, "dead spots" in the floor, "buckling" of flooring, squeaking throughout the floor, some of the butt ends of the flooring pulling apart and the like. It will suffice to note here a number of problems were said to have existed long before the ultimate removal in 1990 of the entire Dion — installed floor and the replacement of that floor by Williams who used, however, not 27/32" thick maple flooring but 33/32" maple flooring. Parenthetically we note here that the Williams floor used this CT Page 10076 thicker lumber as specified in the new specifications for the replacement floor which new specifications were also drawn by Kosinski, the same architect who drew the original plans and specifications.
Many meetings of the Building Committee were held, some attended by both parties to this action as well as other persons. On-site inspections took place from time to time at which, among others, the parties, architects, experts, manufacturer representatives and others attended. Proposals and attempts at resolution of what the defendants maintain was a worsening situation were explored and which the plaintiff, at bottom, contended that not until almost the institution of this action never did the proper person, i.e. the architect ever inform it that the floor was defective and had to be removed. The resolution of those issues between the parties do not require more to be said here but do later.
At this point it is significant to state, however, that credibility is focal to passing upon issues in this case. As indicated credibility is focal and several relevant principles on that are appropriately referred to here. It is well-established that where a case is tried to the court the trial judge is the sole arbiter of the credibility of the witnesses. The credibility and weight to be given expert testimony is for the trier of fact and the trial court is privileged to adopt whatever testimony it reasonable believes to credible. Transportation Plaza Associatesv. Powers, 203 Conn. 364, 378 (1987). Where there is conflicting testimony from experts the trier may believe all, some or none of the testimony of a particular witness. Dooley v. Leo, 184 Conn. 583,586 (1981). Bearing upon credibility it has been noted that the factfinder has "the unique opportunity to view the evidence in a totality of circumstances including into observations of the demeanor and conduct of the witnesses and the parties. . . ."Sportsman's Boating Corporation v. Hensley, 192 Conn. 749, 750
(1984). It may also consider the interest of any witness in determining credibility. Buonano v. Cameron, 131 Conn. 513, 515
(1945). Our Supreme Court has said that "It is the peculiar province of the trial court to observe the demeanor of the parties and their witnesses and to draw inferences therefrom as to the motives underlying their testimony and conduct. Findings based upon these observations in the courtroom are in the same category as findings based upon a view of premises or property. Such evidence is as properly to be considered by the court in rendering its decision or making its finding as if presented by the lips of CT Page 10077 witnesses." Dadio v. Dadio, 123 Conn. 88, 93 (1937); Auger v.Auger, 133 Conn. 211, 213-214 (1948).
The trier is not bound by the uncontradicted testimony of any witness including experts. Mather v. Griffin Hospital, 207 Conn. 125,145 (1988); Bieluch v. Bieluch, 199 Conn. 550, 555 (1986). "Testimony that goes uncontradicted does not thereby become admitted or undisputed; [citation omitted] nor does the strength of a witness' belief raise it to that level." Stanton v. Grigley,177 Conn. 558, 563 (1979); Barrila v. Blake, 190 Conn. 631, 639 (1983).
Included in the evidence is not only that of witnesses at the trial but also a number of exhibits, approximately one hundred and seventy. Of that one hundred and seventy exhibits are certain of the Building Committee Minutes of the defendant Town. There are about forty exhibits which are the minutes of certain meetings of Building Committee covering a period from November 7, 1988 through March 18, 1991. These Building Committee minutes included statements and or views attributed to those in attendance and in some instances, to those not in attendance. In addition to Building Committee members, various people would be in attendance at various times including Neil Prete and John Prete (both officers of the plaintiff), Peter Kosinski, John Dahlberg, (the Director of Physical Plant for the Town including the Hand School), Connor representatives, counsel for the defendant as well as others.
The Building Committee minutes were taken by Elizabeth Quilliam, an employee of the defendant Town. She attended most of these meetings. There was "a couple of times" that she was not there and whoever was the official Chair on those occasions would take the notes. In any event, Quilliam took the minutes in pen and ink on paper, no tape was made. She would then type up the minutes and give them to the Chair. On occasion a member or members would amend or correct her submissions. The minutes as approved, she said, would not show what was stated in her original submission but rather only the correction or amended portion. She said that she could not say she always got the exact words spoken, but she did strive to get fairly the sense of what was said.
Among the exhibits there were also what were referred to as Job Meeting Minutes, about ten on number. They covered a period from about May 10, 1988 to February 7, 1991. These minutes were compiled by representatives of the architect Kosinski such as Shoemaker, Bellows and Delorge, who were also architects. Others also attended various Job Meetings such as Building Committee CT Page 10078 members as well as Neil Prete, Joy Miner, John Dahlberg and others. Other exhibits included photos, correspondence, letters and the like. This court has considered all the evidence, whether from witnesses or exhibits.
As we have already indicated the gym floor was turned over to the Town on about November 21, 1988 and problems with the floor were first claimed to be evident in late January 1989 during the heating system. It is claimed in the Building Committee minutes of January 30, 1989 that there was "a major problem" with the gym floor "as there are wide gaps all over the place due to shrinkage." It is there stated that "this should be addressed immediately as it is not a normal shrinkage situation." There is no attribution as to which person or persons made these observations nor to their expertise. There was some separation of some boards at that time, the degree of which is not at all clear. In any event, this generated a long series of meetings, on-site gym inspections, discussions and proposals additional concerns about the floor, the scope of the floor problems, etc. as to how to remedy the allegedly defectively installed floor. Experts came and observed and opined at various times with their opinions for and against the claims concerning this floor.
 II.
Prete first claims that this court must find, as the architect did in approving them that based on the applications and certificates for payment in evidence as Exhibits C, D and E, Prete had installed the wood floor in accordance with the requirements of the contract documents. In this case the contract documents consist of the following: The original contract between Prete and the Town (Exhibit A), the Project manual (Exhibit 47) which contains, inter alia, the general conditions and the specifications, the plans in Exhibit 34 (Sheet A, which was of the gymnasium) and Addendum No. 1 and Addendum No. 2 (Exhibits 48A and 48B). The contract documents are intended to be the entire and integrated agreement between the contractor (Prete) and the owner (the Town). See Exhibit B (AIA Form A201, 1976 Edition § 1.1.2). Prete argues that when the architect, Howard Shoemaker from Kosinski's office, signed Exhibit D on February 6, 1990, that thereby the architect expressed the unqualified opinion that Prete, as the contractor, should be paid and that the work had been properly performed. Essentially Prete argues the same as to Exhibits C and E. Doing so, Prete contends, represents a decision of the architect regarding Prete's performance as the contractor CT Page 10079 which decision the architect is authorized to make under the contract documents just as much as the architect's refusal to direct that the Dion floor be removed would be a decision by him as to the quality of the work of the installation of this floor. Shoemaker was Kosinski's architect on the gym scene after Delorge, another architect of Kosinski's left his position at Kosinski's firm. Prete argues inter alia that the Town could have appealed the architect's refusal to require it to remove the floor under § 2.1.2 of the General Conditions. Because, however, it failed to do that, the Town then cannot now require the court to find contrary to the architect and to set off the amount claimed to have been paid to replace the floor from the amount due the contractor. In this respect Prete also argues that the Town's claim that Peter Kosinski's letter to it, dated June 19, 1990 (Exhibit VV) constitutes a decision that the floor should be replaced is just not so and should be rejected. Prete's position here, implicitly indicates that any claim of the Town that the Town also so informed Prete earlier that the floor must be replaced is wholly inappropriate because under the contract documents, the architect is the only one who grants acceptance or orders rejection of work and the architect's action in approving Prete's applications for payment in Exhibits C, D and E show the architect's approval. The Town and Kosinski appear to argue that Kosinski's letter to Prete of June 19, 1990 (Exhibit VV) nullifies the prior architectural approvals of Exhibits C, D and E, as will be seen below we do not agree with this.
The Town argues that Prete rests his claim to damages here in this case largely on his position that Exhibits C, D and E require that the court find for it. The Town argues that Prete, in seeking to avoid its contractual obligations "rests its case primarily upon the signing by Howard Shoemaker on February 6, 1990 [Exhibit E] of a requisition for payment." The Town, in countering Prete's claim that Exhibits C, D and E require finding for it, points to Article 9 § 9.9.4 of the General Conditions and there maintains that even had the Town paid the requisition in Exhibit E or the entire contract price, "the Town would not be barred thereby from proceeding to recover from the contractor the costs of the replacement floor, once the original floor had been determined to be defective." This general statement would appear to have some merit "if the original floor has been determined to be defective" which, of course, is clearly in issue in this case. Interestingly, the Town explains its by-pass of Article I § 9.6.1 of the General Conditions which provides "that the architect ". . . may nullify the whole or any part of any Certificate for Payment previously issued CT Page 10080 . . . to such extent as may be necessary in his [the architect's] opinion to protect the Owner from loss because of: 1. defective work not remedied . . ." by arguing that that section is not mandatory because the use of "may" which is used as opposed to "shall" vests discretion in the architect to use or not to use § 9.6.1.
Going on, the Town objects to Prete's "frequent reference" at trial of § 2.2.7 of Article 2 which states: "The architect will be the interpreter of the requirements of the contract documents and the judge of the performance thereunder by both the owner and contractor." It characterizes Prete's argument here to be that § 2.2.7 forecloses the Town from claiming that the floor was defective because the architect Shoemaker had signed Exhibit E on February 2, 1990 which position the Town says is directly contrary to § 9.5.5 and in "direct conflict" with certain claimed applicable Common Law for which it cites certain Connecticut cases, i.e. Townof Milford v. O'Neill, 8 Conn. Sup. 403, 414 (1919) and Vernali v.Centrella, 28 Conn. Sup. 476, 482-483 (1970). Parenthetically, we consider these last two cited cases inapposite. We have no quarrel with the proposition that parties contract with reference to existing law, except when the contract discloses a contrary intention. Hatcho Corporation v. Della Pietra, 195 Conn. 18, 21
(1985) (Existing statute to be read into contract unless contrary intention appears); Cislo v. City of Shelton, 35 Conn. Sup. 645,652 (1978). Prete, countering, recognizes § 9.5.5 and points out that it is not asking this court to hold that the Town does not have the right to terminate or correct work under § 9.5.5 but that it is claiming that the Town has no right to require Prete to pay for the floor because the Town itself failed to follow the contract documents, particularly with reference to its conduct in declaring the floor defective and not paying Prete. Here Prete says that the apparent common law warranty argument the Town makes against it fails because the architect did not make any such finding even after considering that issue and that Prete is correct in arguing that under § 2.2.7 the architect interprets the contract and is the judge of the performance or failure of performance by the parties. After all, we believe that § 2.2.7 is clear and nothing on the contract documents indicates a contrary intention. The Town, in failing to do so, has not addressed § 2.2.7 in the light of another statement in Hatcho that "Parties generally do not insert meaningless provisions in their agreements and therefore every provision must be given effect of reasonably possible." HatchoCorporation v. Della Pietra, supra.
III.
CT Page 10081
We turn to the plaintiff's claim that this court should find that based on the applications for payment, i.e. Exhibits C, D and E, as the architect did, that it installed the wood floor in accordance with the requirements of the contract documents. Under the General Conditions "the Contract Documents form the Contract for Construction. This Contract represents the entire and integrated agreement between the parties . . . and supersedes all prior negotiations, representations, or agreements, either written or oral. . . ." "A contract is to be construed according to what may be assumed to have been the understanding and intention of the parties. . . . That intention is to be determined from the language used, according to the situation of the parties and the circumstances of the transaction. . . ." Lar-Rob Bus Corporation v.Fairfield, 170 Conn. 397, 406-407 (1976). Contracts are to be construed as a whole and all relevant provisions should be construed together. Fletcher-Terry v. Grzeika, 1 Conn. App. 422,431 (1984). "The construction and legal effect of the expressed terms will not be varied by reason of inconvenience to the parties or unreasonableness of the terms." Hatcho Corporation v. DellaPietra, 195 Conn. 18, 21 (1985). The motives of the parties and the ends which they sought to accomplish by their contract are relevant factors in ascertaining intent. Colonial Discount Co. v.Avon Motors Inc., 137 Conn. 196, 200 (1950).
Before any determination can be made of the plaintiff's claim that the architect's approval of Exhibits C, D and E require the conclusion for which the plaintiff urges, it is necessary to discuss other relevant claims and arguments. First, we look at the plaintiff's position concerning the letter dated June 19, 1990 to it from Peter Kosinski concerning the gym floor installed at Hand. That letter (Exhibit VV) to the plaintiff states in full: "This office has inspected the gymnasium floor at the Daniel Hand High School and has found it to be unacceptable. The floor does not meet the quality standards specified within the contract documents. There is also a concern that an accident could occur because of the condition of the floor." When pressed on cross examination about why he was not more specific in his letter of June 19, 1990, he said that it implied that the floor was to be removed. It is worth noting that his architectural representative on the job, Howard Shoemaker, who signed the approval for payment that is Exhibit E had refused to sign the Kosinski's letter of June 19, 1990 (Exhibit W). Prete argues that Kosinski's statement that "the floor does not meet the quality standards of the specifications is not enough to trigger an obligation to remove the floor or be responsible for CT Page 10082 the cost the Owner incurs to remove and replace the floor." Rather, it claims that the underlying issue is whether the floor was installed in accordance with the contract documents and, there, it contends that the applications for payment, Exhibits C, D and E, each signed in approval by the architect, are "overwhelming evidence that the floor meets those requirements."
Interestingly, the architect's approvals of payment by Prete were signed by the architect some months before Kosinski's letter of June 16, 1990. The approvals in Exhibit C, D and E are dated September 12, 1988, February 6, 1990 and February 6, 1990 respectively. The defendant, however, maintains that in "ordering" Prete to remove the floor because of Prete's alleged breach of contract and in its proceeding to replace it, that the Town was proceeding throughout in accordance with the contract documents. This claimed consistent adherence by the Town to the contract documents includes those communications by the Town to Prete prior to Kosinski's letter of June 16, 1990. This court does not agree with the defendant Town here.
Assuming arguendo that the Kosinski June 16, 1990 letter was the architect's opinion that the Dion — installed floor had to be removed because its installation was in breach of the contract between the parties, that letter was the first such expert opinion by the architect in writing given to the plaintiff in accordance with the contract documents. We should say here that, prior to June 19, 1990, there had been no oral statement by the architect to Prete that the floor was "unacceptable" or "defective"
Article 2 of the general conditions is entitled the "Architect". Under the General Conditions § 2.2.7 of the contract, "the Architect will be the interpreter of the requirements of the Contract Documents and the judge of the performance thereunder by both the Owner [the defendant Town] and Contractor [Prete]." Under § 2.2.9 of these conditions "claims, disputes and other matters in question between the contractor and the owner relating to the execution or progress of the Work or the interpretation of the Contract Documents shall be referred initially to the Architect for decision which he will render in writing within a reasonable time." See also § 2.2.8. The architect has authority ". . . to reject Work which does not conform to the Contract Documents. . . ." General Conditions § 2.2.13. In § 2.2.10 it is required that "all interpretations and decisions of the Architect shall be consistent with the intent of and reasonably inferable from the Contract Documents and will be in writing or in the form of drawings. . . ." CT Page 10083 This same section also states that the architect, "as interpreter and judge . . . will endeavor to secure faithful performance by both the Owner and the Contractor, will not show partiality to either, and will not be liable for the result of any interpretation or decision rendered in good faith in such capacity." It is clear from the General Conditions in § 2.2.2 that "the Architect will be the Owner's representative during construction and until final payment is due . . ." and that he ". . . will advise and consult with the Owner . . ." and that "the Owner's instructions to the Contractor shall be forwarded through the Architect. . . ." That section also provides that the architect is to have authority to act on behalf of the owner ". . . only to the extent provided in the contract documents, unless otherwise modified by written instrument in accordance with Subparagraph 2.2.18." Section 2.2.18 provides that "the duties, responsibilities and limitations of the Architect as the Owner's representative . . . will not be modified or extended without written consent of the Owner, the Contractor and the Architects." At this point we note that there is no evidence to show that there was any such modification or extension in this case. There is no evidence to show, as required under § 2.2.5 that the architect was unable to have access "at all times" to the work being done in the floor installation process by Dion in 1988. Actually, with reference to § 2.2.17, the owner and architect did agree that the architect Kosinski provided a "Project Representative to assist the Architect to carry out his responsibilities at the site . . ." and that was one James Miner (also known as Jay Miner). The same provision, i.e. § 2.2.18 declares that "the duties, responsibilities and limitations of authority of any such Project Representative shall be as set forth in an exhibit to be incorporated in the Contract Documents." There is in evidence as Exhibit M referred to above, the contract of December 15, 1987 between the architect Kosinski and the defendant providing for the services as the "Owner's Project Representative" of James Miner covering his authority, duty and responsibilities and who so acted during the floor installation by Dion.
In addition, the architect, under § 2.2.6, based upon his observations and an evaluation of the Contractor's applications for payment ". . . will determine the amounts owing to the Contractor and will issue Certificates for Payment in such amounts as provided in Paragraph 9.4." Exhibits C, D and E are such certificates of payment each of which had, some months prior to Kosinski's letter of June 19, 1990, been approved by architects from his architectural firm. The matter of "Certificates of Payment" to the contractor is found in Article 9 of the General Conditions and § 9.4 CT Page 10084 of that article provides for the architect's action on such application for payment by way of approval or the withholding of it in whole or in part. One of the general conditions under Article 3, which refers to "Owner's" is § 3.2.6, that is a one sentence provision which declares that "The Owner shall forward all instructions to the Contractor through the Architect." We note that at a June 4, 1990 meeting, of the Building Committee, the minutes noted "There must be a letter sent by architect to Prete" as well as their attorney saying that "we would be better off if the architect is behind us on this matter." The tardy letter of the architect in Exhibit VV, under all the circumstances, including our conclusion of no material a breach, does not nullify the approvals in Exhibits C, D and E.
On the other hand, the Town refers to Article 2 which is entitled the "Architect" quite sparingly in its analysis of the proper procedure to be used under the contract to replace the "defective gymnasium floor." Criticizing the "frequent reference" by the plaintiff to § 2.2.7 which the Town suggests the plaintiff argues "forecloses" the Town from claiming the floor was defective because Shoemaker signed his approval in Exhibit E (Prete's Application for payment of June 16, 1990) the Town claims that it is directly is contrary to Article 9, § 9.5.5. That provision provides that "No certificate for a proper payment, nor any proper payment, nor any partial or entire use or occupancy of the Project by the owner, shall constitute an acceptance of any work not in accordance with the Contract Documents." We have no serious argument with what § 9.5.5 provides, but considering the entire contract in context as we must, § 9.9.5 it is not contrary to § 2.2.7 under the circumstances.
The Town's other reference to Article 2 is again § 2.2.12 vis a vis amended § 7.9.1 as concerns arbitration. The plaintiff seem to have overlooked that the operative arbitration option of solving contractor-owner disputes was amended § 7.9.1 and not the original § 7.9.1. The former required arbitration "if both parties agreed in writing" while the latter did not. The Town, therefore, was not required, as Prete appears to claim to go to arbitration.
Further, in contending that it "properly proceeded" under the contract documents to replace the "defective" floor when Prete refused to do so, the Town advances other claims. Prete argues, inter alia, it did not have to replace the floor because it was not "defective". However, the Town points to § 3.4.1 entitled "Owner's Right to Carry out the Work." There the Town maintains that CT Page 10085 "general condition Article 3.4.1 gives the owner the right to make good deficiencies in the work if the contractor fails to do so after notice." Here it argues that notice was given twice by Mr. Murphy as Chair of the Building Committee, in his letter of May 26, 1989 to Prete (Exhibit BB) and later on behalf of the Town, in his letter of January 31, 1990 (Exhibit KK). In addition, it maintains that notice was also given to Prete by its counsel by letter dated May 9, 1990 (Exhibit RR) and by the architect Kosinski by letter dated June 19, 1990 (Exhibit VV).
The role of the architect under the Contract Documents under the circumstances, is disserved by the Town's argument on this branch of the case. We have been at some length to point out his role under the Contract Documents in his contractual interaction with both Owner and Contractor. He is the one who decides whether the floor is defective or whether it fails to conform into the Contract Documents, not the Owner. Section 13.2. The Owner is required "to forward all instruction to the Contractor through the Owner." Section 3.2.6. It is true that, the architect can withhold or modify a Contractor's application for payment. Section 9.5.5. But the contractual intent, as expressed, makes the architect the one who makes this judgment and, as with the parties themselves, that is to be done in good faith which along with fair dealing. See Grenier v. Compratt Construction Co., 189 Conn. 144,148 (1983); John T. Brady Co. v. Stamford, 220 Conn. 432, 450
(1991).
Kosinski himself admitted that never before June 19, 1990 had he informed Prete that the floor was "unacceptable"; this concession obviously must be considered in the light of the fact that his people had earlier approved Exhibits C, D and E which approval has never been nullified by the architect as provided by § 9.6.1. The letters in Exhibits BB and KK from the Building Committee were forwarded when the Town had had no determination from its own architect that Prete had not installed the floor as agreed "within the contract documents".
We now turn to the "notice" given by counsel for the Town in his May 9, 1990 letter to Prete (Exhibit RR). This letter is dated May 9, 1990 and is from defendant's counsel to Prete. Inter alia, this letter states "As you know, the [Building] committee and the Architect Peter Kosinski have determined that the gymnasium floor was not installed in accordance with the specifications in the contract and the work is defective and fails to conform to the contract documents. . . ." It also informs Prete that "At your CT Page 10086 request [Prete's] the Building Committee permitted you in the summer of 1989 to make an attempt at correction by meaning of placing two coats of sealer" and Mr. Murphy, by his letter of August 1, 1989 reserved the "Town's right to reject this flooring installation in its entirety if the conditions experienced last winter recur during the basketball season. Rejection will require complete replacement.'" Referring to the two coats of sealer applied to the floor in the summer of 1989 by Prete this letter then says that Prete's "corrective attempts were unsuccessful" The letter goes on: "The Committee has been advised and agreed, and the Architect concurs, that the entire floor must be replaced and refinished" at Prete's expense under the Architect's supervision "in strict compliance" with the contract. It further maintains that pursuant to Article 13 of the contract, which is entitled "Uncovering and Correction of Work" that Prete has breached the contract and it references Article 13.2 and 4.5. In addition, it states that defendant's counsel reads Prete's letter of February 26, 1990 "to be a rejection of Mr. Murphy's letter of January 31, 1990 (see Exhibit KK above) ". . . which [directed]** replacement and finishing of the floor." Finally, it informs Prete, apparently invoking 3.4.1, that "unless immediate arrangement satisfactory to the Town and the Architect within seven (7) days from the date of your receipt of this letter . . ." the Town will proceed under the contract to, among things ". . . remedy the work and charge all necessary costs to [Prete]."
Prete replied to the foregoing letter of defendant's counsel by its letter of May 17, 1990. It stated that it had never received a determination by the architect Peter Kosinski that the gym floor was not installed in accordance with the specifications incorporated in the contract and that Kosinski "has never said that the work is defective or that it fails to conform to the contract documents." Rather, it goes on to say that "the only person from whom we have received any claim that the floor is defective in some way is Mr. Murphy" and that "this claim has been never been supported by any professional opinion or written opinion from the architect" and that "we will not consider the matter until some backup documentation and opinion is supplied." That is true. Concerning the sealer, Prete maintained that under the maintenance instructions provided by the manufacturer (Connor) the defendant Town was required to reseal the floor each year as a condition of continuing the warranty, but that Prete, on its own initiative, to maintain the warranty and to perform routine maintenance not required under the contract, issued a change order to Dion to reseal and that it intended to claim that amount from the Town in CT Page 10087 arbitration. It also pointed out Dion had returned and dealt with "dead spots" in the floor that were identified to him and would return and deal with other dead spots that appear. Prete said that such work was not corrective but simply maintenance required by the guarantee. Further, it also said "The analysis of the floor has yielded the following information. The area in which the floor is placed must be maintained at a relative constant humidity. The Town of Madison refuses to maintain the school building at the appropriate humidity. Therefore, the floor expands and contracts more than should be reasonably anticipated because of the fluctuation of the moisture content of the air. It is clear in the manufacturers specifications that the town must make an effort to moderate the atmosphere around the gym floor. If it fails to do so, it will void the guarantee and cause the floor to continue to expand and contract at rates which will continue to cause distortion." Prete closed its reply by stating that the cited portions of the contract, i.e. Articles 13.2 and 4.5 did not apply because more than one year had passed since the installation, that there was no finding by the architect the work was defective or does not comply with the plans and specifications, that it had made no general warranty about the suitability of the floor and that it had discharged its obligation which was to construct the building in accordance with the plans and specifications.
Having set out the above we conclude that the defendant Town did not follow the proper procedure under the contract documents and/or Connecticut law in proceeding to replace the "defective" floor. It is clear that the architect, under the contract documents, was the proper person to make this determination in this case. Not only was it agreed that instructions to the contractor from the owner were to come through the architect but the Town, did not until Kosinski sent his "unacceptable" letter of June 16, 1990 ever cause the architect to give Prete such an opinion in accordance with the contract documents to Prete that the floor was "defective". We see no claim made by the defendant that some informal statement in the Building Committee minutes, either alleged to have been made by Kosinski at some time before June 19, 1990 that Kosinski had given Prete such an opinion. Even if any were made, it must be rejected especially because it was never conveyed to Prete certainly not before Kosinski's "unacceptable" letter of June 16, 1990. There is some suggestion by the defendant that the architect's (Kosinski's) decision that the floor should be replaced was made at the Building Committee meeting of April 9, 1990 at which Kosinski, defendant's counsel, Kenneth Borst and John Dahlberg were, inter alia, present. Prete was not present. Murphy CT Page 10088 was not at that meeting due to his absence for surgery but Borst was Chair in his absence. If it was, and it may have been, there was no architect's letter to Prete until June 19, 1990. Dahlberg was available at the time of trial, and was a witness within the Town's power to produce and was a witness who would naturally have been produced by it. See Secondino v. New Haven Gas Co., 147 Conn. 672
(1960). He did not testify. He could have shed real light on what happened there especially keeping in mind that the April 9, 1990 Building Committee minutes include the unanimous passage of a motion to replace the floor and that Borst asked Kosinski to provide specifications for the replacement floor. This all took place, of course, while Prete's applications for payment in Exhibits C, D and E were all still out properly approved months before for payment by architects from Kosinski's office. This all took place before Kosinski had even written Prete his June 16, 1990 letter, which his own architect Shoemaker (who had approved Exhibit E) had refused to sign in June 1990. Actually defendant counsel's letter in Exhibit RR predated Kosinski's June 19, 1990 letter by more than a month. Prete's reply to that letter also predated that Kosinski letter also by more than a month. Interestingly, the Building Committee meeting minutes of June 4, 1990 discloses that defendant's counsel said "a letter should be written to Kosinski concerning default by Prete." Immediately thereafter these minutes state "Peter Kosinski is reluctant in the matter due to his desire to keep out of it because of their specs. There must be a letter sent by architect to Prete." Defendant's counsel then said "we would be better off if the architect is behind us on this matter." At the trial Kosinski was quite firm that under the contract documents it is the architect who decides if the work in question is defective or not. It is clear that the Town did not, until shortly before his June 19, 1990 letter, ever asked Kosinski to inspect as it could under § 2.2.13 which gives the architect the right to reject work. It is noted that in the Building Committee minutes of June 25, 1990 at which both Murphy and Borst and other Building Committee members were present the following appears in the minutes of that meeting. "Gym floor litigation: Peter Kosinski will write to Prete but said that he would only say the floor was not satisfactory, not that it needs to be replaced. At first he used the ploy that he would not write because the Committee owes him money. He finally acquiesced to writing the letter as stated above." These minutes, which Mrs. Quilliam said had corrections, do not, as appeared to by the general practice, indicate that Kosinski was among those attending that meeting. Mrs. Quilliam testified that she could not say who made the "ploy" remark except that it was made by someone in attendance at that time. At the CT Page 10089 trial, Kosinski said the "ploy" remark was an insult as he maintained that he had supplied documentation for every penny of the $98,000.00 that was then owing to him by the Town. In any event Kosinski did not recall the "Ploy" incident and moreover maintained that he did not get the minutes of the June 25, 1990 meeting of the Building Committee. The Building Committee minutes of July 2, 1990 reveal that the Building Committee authorized the payment to Kosinski of $25,000.00 in full and final payment of his services to that date on his contract with the Town.
We conclude for the reasons given that the Town did not act in accordance with the contract documents and Connecticut law, in proceeding to replace the entire floor. It did not adhere to the contract documents but violated their contractual obligations to the contractor by circumventing the role of the architect which not only the Town as owner but the contractor had undertaken to recognize. Prete was correct in insisting that the architect's opinion had to be given to it under the contract documents. Only shortly before June 19, 1990 did the Town decide to advert to that. These can be little doubt that there were "problems" with the Dion-installed floor that first surfaced in the early winter of 1989. Significantly, however, the charter of the parties, i.e. their contract, for determining the existence of a breach as claimed including the defectiveness, how extensive the defectiveness was and the agreed method of proceeding and remedy was not followed by the Town.
This conclusion, however, does end our inquiry because we should now decide whether, under all the circumstances, the plaintiff has sustained its burden of proof that it performed its contract and did not breach it and is, therefore, entitled to damages on its complaint. We reach and decide this, despite the defendant's failure to follow the contract documents in declaring Prete breached the contract and then in replacing the entire gym floor. That includes, as already decided, the bypass by the Building Committee of the architect's vital role in the declaration of the defective nature in the floor installation but also the lack of information about the entire Dion-installation, including the so-called subflooring, when it "ordered" the entire floor replaced.
In order to address this issue of Prete's performance and/or breach of its contract, certain additional legal principles as well as other circumstances need be set out. It is important to keep in mind, however, that "It is not every dissatisfaction with a contract performance, nor even every breach — but only a material CT Page 10090 breach — that excuses performance by the other party. . . . The circumstances significant to that determination are given in Restatement (Second) of contracts § 241 (1981)." Health RelatedServices v. Golden Plains, 800 S.W.2d (Mo.App. 1991). It has been said that "A material breach is one that has been defined as one that would justify the other party to suspend his own performance of the contract. 6 Williston on Contracts § 864 at 290 (3rd ed. 1963); 12 Williston on Contracts § 1469 at 186 (3d. ed. 1970)." Lanvin Inc. v. Colonia Inc., 739 F. Sup. 182, 195 (1990). Not every breach of duty by one party to a contract discharges the duty of performance of the other. See 6A Corbin on Contracts § 1253 at 9-10 (1962); Calamari Perillo, Law of Contracts, § 11-22 (3d. ed. 1987); See Fitz Coutinho, 622 A.2d 1220, 1223 (1993). Our Supreme Court has noted that it is appropriate to look to "the multi-factor standards for materiality of breach contained in the Restatement (Second) of Contracts § 241 (1981). . . ." Bernstein v.Nemeyer, 213 Conn. 665, 672 (1990). That section of the Restatement provides:
 "In determining whether a failure to render or to offer performance is material, the following circumstances are significant:
 (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
 (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
 (c) the extent to which the party failing to perform will suffer forfeiture;
 (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
 (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." CT Page 10091
We observe that the § 241 factors are to be applied in the light of the facts of each case in such a way as to further the purpose of securing for each party his expectation of an exchange of performance. 2 Restatement 2d Contracts, § 241, Comment a at pages 273-278. Moreover, "the standard of materiality for the purposes of deciding whether a contract was breached `is necessarily imprecise and flexible' Restatement (Second) of Contracts § 241 cont. a." Stone Forest Industries v. United States,973 F.2d 1548, 1551 (Fed. Ct. 1992). The materiality of a breach is usually a question of fact, McKnight v. Midwest Eye Institute,799 S.W.2d 909, 915 (Mo.App. 1990) citing J. Calamari J. Perillo, The Law of Contracts, § 11-22 (3rd ed. 1987); see also II Farnsworth on Contracts (1990) § 8.16. Before, however, looking further into the multi-factor standards of § 241 as applied to this case we must set out further law and evidence to assist in applying those standards. It has been said that "A material breach is one that has been defined as one that would justify the other party to suspend his own performance of the contract. 6 Williston on Contracts § 1469 at 186 (3rd. ed. 1970)." Lanvin Inc. v. ColoniaInc., 739 F. Sup. 182, 195 (1990). In that regard it has also been said that "The breach must be material, that is, it must be so important that it vitiates or destroys the entire purpose for entering into the contract." In re Fahnders, 66 B.R. 94, 95-96
(1986). One court has aptly observed that "Contract law has always distinguished between `material' and `immaterial' breaches. If a breach is immaterial, the existing rights of the parties do not change. The contract remains enforceable although the breach may occasion liability for damages, if any can be proved. . . . A material breach, on the other hand, does affect the substantive rights of the parties. A substantive or material breach is one which touches the fundamental purpose of the contract and defeats the object of the parties in making the contract. . . .'" Aldape v. Lubake,668 P.2d 1221, 1223 (Idaho App. 1984).
The materiality of a breach is usually a question of fact,McKnight v. Midwest Eye Institute, 779 S.W.2d 909, 915
(Mo.App. 1990) citing J. Calamari J. Perillo, The Law of Contracts, § 11-22 (3rd ed. 1987); see also II Farnsworth on Contracts (1990) § 8.16. Whether a breach is material is a question of degree to be determined in the light of the circumstances of each case.Bernstein v. Nemeyer, 213 Conn. 665 (1990); In re Fahnders, supra 96. We note that it seems fair to say that "a court should not view any breach of contract in isolation, but rather must consider the totality of breaches [if that is the case] and overall effect on the purpose of the contract on the nonbreaching party." See InCT Page 10092Re DeRosa; 98 B.R. 644, 648 (R.I. 1989). The nature of building construction contracts has been said to be such that they have been referred to as admittedly sui generis. See Burns v. Gould,172 Conn. 210, 221 (1977), see also M.J. Daly Sons Inc. v. New HavenHotel Co., 91 Conn. 280, 289-90 (1917). Generally speaking, their complexity of such contracts in many cases may be said to suggest why the standard for the materiality of their breach counsels flexibility in such a determination under § 241 of the Restatement Second of Contracts.
So in order to spell out the Town's claim that the floor as installed by Dion was "defective" under the contract documents, thus resulting in a breach by Prete of its contract, additional background circumstances need be set out. Under § 09560 of the specifications entitled "Gym Wood Strip Flooring", Prete was required to supply a gym floor from a manufacturer set out in that section including wood flooring of 27/32" thickness. It hired Dion who supplied and installed a Connorloc Floor System, one of those permitted under the specifications. The manufacturer of this system Connor supplied a document to Dion that included recommendations to be followed in the floor installation that were similar to but not exactly the same as the Kosinski specifications for the gym floor.
Although there was no objection to Dion as the floor installer, from anyone including the architects when he was retained and during the course of installation, the Town now attacks his inexperience for this job as allegedly shown by the "defective" installation. This is not quite the case. Dion had had about thirty years experience in the floor installing business. It is true that this was the first clip and channel floor system he had installed from start to finish and that he had been a Connor — authorized dealer for only four months when he got this job. Over his career which included installing about 10,000 residential floors, he had installed and/or repaired gym floors (basically nail-down systems), installed and/or repaired bowling lanes in bowling allies as well as having laid dance floors. Prior to undertaking the Hand gym job he had attended seminars and received training from Connor representatives and had gone over the specifications for the Hand job with Connor representatives. The installers he used at Hand were all experienced floor installers. Connor representatives also visited the site during the Dion installation.
In resisting the plaintiff's claim that it is not in breach of CT Page 10093 contract, the plaintiff depends heavily on the architect's approval of its applications for payment in Exhibits C, D and E. The defendant, of course, maintains that the floor was "defective" and not installed in accordance "with the architect's specifications or the manufacturer's recommendations" and there the defendant also argues that Dion's own "Daily Documentation" shows that the environmental conditions were not within the specification requirement. It is true that Dion's readings, as recorded on Exhibit I, did not, insofar as the architect's specifications for room temperature, comport with those. Rather, over the fifteen days covered in Exhibit I, Dion's readings average to just under 77° F which is higher than the 75°, the upper temperature in those specifications. Insofar as the manufacturer's recommendations as to temperature, which along with those on humidity were said to be "guidelines", given the fact that the manufacturer makes floor systems that are installed all over the country, there was credible evidence that Dion's temperature readings tend to comport more with those than the architect's specifications keeping in mind that the upper limit of those was 78° F. Actually, the readings Dion recorded on Exhibit I he took "in the middle" of the day and so that, according to Dion would be toward the warmest time of the working day. Dion took the readings which he recorded each day on a Delmhorst moisture meter which he used in his work and which he regularly calibrated and the claims of the defendant of the "inaccuracy" of that meter and the "casual manner" in which he used it are rejected. Each day Dion also measured the moisture content of the wood, both installed and not installed. He also recorded these daily on Exhibit I. As with his temperature readings, the ones on the humidity were not uniformly within the exact ranges indicated in the specifications or including those of the manufacturer. However, as we conclude hereafter they were not in the whole picture such as to demonstrate a material breach of contract. The Connorloc system which was an approved system under the architects specifications was one which was "designed to combat the extremities of humidity and moisture." Wood was obviously a vital component of that system and, as the evidence showed, wood" is a hygroscopic material which unquestionably will be effected by changes in temperature and humidity." As to wood, including that used in the Dion floor, it contains moisture which it gets from the temperature and humidity of the air or atmosphere in which the wood finds itself. Humidity is, says Webster, a degree of wetness. Webster's Third New International Dictionary. Humidity changes as does temperature. Accordingly, changes in humidity play an important part in the amount of moisture that wood absorbs or loses. Dion used his Delmhorst moisture meter to measure the CT Page 10094 moisture of the wood at this installation site. The defendant argues that Dion floor was installed when the wood used was "too wet" and so when it dried out the problems showing that became evident. It appears that, as to this type of flooring, that when the wood installed is "too wet", that is not installed under proper conditions that when it dries out it shrinks. Conversely, it seems reasonable to say from the evidence that if wood is installed in a "dry" state, it gets larger as it absorbs moisture. Thus, it would appear that wood is not wholly inert where there are variations in humidity and temperature. The manufacturer inspected the floor during its installation and thereafter and observed that while this floor system is designed to be marketed throughout the country its design has taken into consideration the extreme variations that occur in the Northeast. This included the circumstance that the stability of all wood flooring systems may be affected by the potential for contracting and/or expanding where there are wide variations in temperature and relative humidity especially if wide variations in fact occur.
After a Connorloc floor, such as the Dion installed floor, has been installed and inspected by Connor representatives and given to the owner, this manufacturer issues to the owner (the defendant Town) the so-called Connor Care Card (Exhibit K) which clearly states that the owner and building superintendent should observe certain directions on it. This Care Card sets out that it "should be posted in the Custodial Room and referred to by the Maintenance Engineer." The defendant Town received such a Care Card from Connor. Included in the directions on it are the following: "MAINTAIN PROPER VENTILATION AT ALL TIMES. Circulation of air is essential, especially during the summer months when the building is not in use. NEVER CLOSE UP THE BUILDING WITHOUT PROVIDING FOR VENTILATION. 2. OBSERVE TEMPERATURE AND HUMIDITY REPORTS CLOSELY. Humidity is moisture. The presence of excess moisture in the air means that all types of wood will expand. The absence of moisture vapor means that wood will shrink. HOW MUCH YOUR WOOD FLOOR WILL EXPAND OR CONTRACT DEPENDS ON YOU! Control humidity by keeping fans and ventilating systems functioning, opening and closing doors and windows as necessary. Turn on the heating as well to reduce dampness. Avoid excessive heating during periods of low humidity. The ideal temperature range for wood floors, and other finished wood products is 55° F to 78° F. The humidity range desirable is 35% to 50%. Usually the winter heating season is a period of low humidity — keep the thermostat down!" (Capitalization in original). CT Page 10095
It is the plaintiff's position that even though the specifications may not have been followed precisely that that did not affect the integrity of the flooring system. Among other things, and besides the presence of Miner during the actual installation, it maintains that the defendant Town did not follow the directions on the Connor Care Card once the floor was turned over to them. Therefore, argues the plaintiff, when problems first appeared in the heating season of 1988-1989 it was because the floor had been "baked" by the excessive heat in the gym because of the failure to adhere to the prescribed conditions of care, specifically temperature and humidity. Moreover, the plaintiff points to the returning of the floor to a "more acceptable" state once the heating season was over as it did after the 1988 — 1989 heating season and this scenario occurred again after the 1989 — 1990 heating season with a similar return of the floor once the heating season was over.
When we say "more acceptable", it can fairly be said that as to the use of this floor which was intended by the contracting parties, such language, i.e. more acceptable tends towards understatement. As to its use or "playability" for basketball games there is not a scintilla of evidence that any basketball game had to be cancelled, postponed or called, because of the "defective" condition of the Dion-installed floor. This covers the entire period that the Dion floor was in place. Yes, there was some "dead spots" on this floor which occur where a basketball dropped from a certain height did not come back up as consistently as it should have according to the testimony of Lawrence Ciotti, the athletic director. Ciotti, who was an experienced coach, teacher and administrator had been a college and high school athlete in several sports including basketball. As he testified he said he had played basketball in the Boston Garden which itself had "dead spots". Ciotti said he noticed some boards separating when the heating system was turned on in the 1988-1989 heating season. In addition, Ciotti, whose office at Hand adjoins the gym, noted some "loose" boards and some "spaces" between some boards during the 1989-1990 basketball season. Mr. Ciotti did not monitor the humidity or heating systems from November 1988 to March 1991 (when the new floor was installed) as that was not his job but was the job of John Dahlberg.
In response to an inquiry from the Madison Education Department and in order to ascertain the prevalence of "dead spots", Ciotti personally dribbled and/or dropped a basketball over "each square foot or thereabouts" of the gym and prepared, with the CT Page 10096 assistance of one McMinn, a diagram or map of "dead spots" (Exhibit 57) which was dated January 1, 1990 and was characterized as "very accurate" in showing the dead spots as of his inspection of January 18, 1990. Dion did return, when informed of this, and made repairs to dead spots and he used a basketball in doing so. Parenthetically, the "dead spots" in Exhibit 37 fairly encompass, before any repair of them about 8% of the entire gym floor surface. No one was ever injured by this floor in playing basketball on it.
Quite apart from the use of this gym for basketball, it was also employed for its additional uses for volleyball badminton, wrestling, Recreation Department activities such as jogging. The floor was in use for at least five days every week from 7:30 a.m. to 9 p.m. There is no competent evidence of any person ever being injured by the floor while playing basketball or using the floor for any purpose to which it was put. There is some evidence that in the first heating season and thereafter the floor would squeak on occasion. The credible evidence is that this Connorloc system is a "noisy" systems and will squeak on occasion. Again despite some striking use of adjectives and adverbs describing the problems of the "defective" Dion floor after its installation and up to March 1991 when the new floor was put in, the defendant Town has not produced a single photograph taken of any such problem to demonstrate that. The plaintiff, to be sure, has introduced some photographs of the floor in this period and there were some problems in this approximately 13,000 square foot gym. The defendant, however, had representatives, particularly the architects who approved Exhibits C, D and E, who also saw the same floor and no architect ever, until Kosinski wrote Exhibit VV on June 19, 1990, informed Prete that the floor was such as to be "defective" under the Contract Documents. For our analysis we are treating Kosinski's statement in Exhibit VV that the floor was "unacceptable" as he testified, i.e. to imply removal.
It is noted in passing that, despite the defendant's attack on the temperature and humidity readings taken on behalf of the plaintiff that the defendant produced no evidence of any such readings at all in this case until those taken in March 1991, when it started the replacement floor over two and one half years after Dion had finished installing the floor in August 1988.
It also cannot be overlooked that all during the time Dion was installing the floor in the summer of 1988 that James Miner, the defendant's project representative, was on that site. True, he was the owner's representative for both the Hand High School and CT Page 10097 Jeffrey Elementary School additions, but he was at Hand every day. His duties, responsibilities and limitations of authority were clearly spelled out in Exhibit M. We have already said that there is no basis in the evidence for this court to operate for taking aSecondino inference against either party because it is clear that Miner's is unavailable and that his whereabouts were not known at the time of trial. See Secondino v. New Haven Gas Co., supra. It is noted, however, that although Murphy and Kosinski testified at length there is no evidence from either of them, representing as they do the owner and the architect respectively, of anything untoward in the installation of the floor that came to either of them in any fashion from Miner's presence in the picture. Interestingly, there is no evidence that during the installation of the floor that neither the architect or the defendant Town ever told Prete and Dion that the floor was not being installed properly. John Dahlberg, who is superintendent of physical plant in the Town, including Hand High School, was on the floor site during Dion's installation but he did not testify in this case. Bob Williams, whose company installed the replacement floor with heavier lumber than those of the original specifications, was also there at least twice and told Dion he felt he was doing a good job. Actually, after this job, Williams hired Dion for some floor installation work along the Connecticut shoreline.
Again, returning for the moment to the matter of humidity, the plaintiff points out that the evidence adduced by it from the data compiled by the National Oceanic and Atmospheric Administration (NOAA) for the Bridgeport area for the year 1988, fairly indicates that, on the average, the humidity never, came down into the range recommended by the manufacturer, i.e. relative humidity range of 35° to 50°. This would appear to be true for the months of July and August 1988. This would also fairly appear to be true as to the architect's specifications of 35 to 50 degrees relative humidity. The climatological data adduced by the defendant in its submitted NOAA data does not contain humidity data for July and/or August 1988 that could serve to contradict this. While Bridgeport is, of course, not Madison, it is along the Connecticut shoreline.
Turning to the Kosinski specifications in the Contract Documents it appears that the contractor was required under "Environmental Requirements" to "Maintain room temperature of 65 to 75 degrees F and 35 to 50% [sic] relative humidity during and after installation." We have already indicated that there was not full compliance by Dion with the temperature provisions and/or the Connor "guidelines" in Exhibit G. Connor representatives, including CT Page 10098 Al Stafford, the president of the manufacturer along with Brad Karnstedt were present during the installation and specifically they were there when the moisture in the lumber installed was the highest on the job according to Dion's recorded readings on Exhibit I. They looked over the entire job, they checked Dion's documentation, they took their own readings and they looked at Dion's meters and gauges and they did not stop Dion's work for any reason at that time. The focus, however, in this case cannot be solely the installation itself especially keeping in mind that the owner's architect has approved Exhibit C, D and E.
Nevertheless, a floor installation such as this requires careful monitoring particularly when undertaken and done in the summer season. When Dion and his men came each morning they opened all the windows and all the doors of the to keep air circulating. The gym itself had very few of its doors that opened directly to the outside while most of them opened on to other corridors and the like. The gym itself had no air conditioning system according to the architect Kosinski. There was no facility in the gym, insofar as Dion knew, to control the humidity in the summertime. Dion did not ask Prete to furnish any ventilation or dehumidifying devices. Dion did, however, recognizing that the summer humidity visa vis it effect on the moisture content of wood, attempt throughout the installation to put in the flooring as "tight" as possible. This was done by striking a dummy piece of wood held lengthwise against the flooring piece then being installed so as to make for a tighter fit by thus driving out moisture. Williams, who installed the replacement floor, also did this noting it was to make the floor fit tighter.
No significant discussion of the claimed "defective" installation of the Dion would be complete without further reference to John Dahlberg, who was at all relevant times from and during the 1988 installation of the floor by Dion through the June 16, 1990 "unacceptable" letter in Exhibit VV by Kosinski, the director of physical plant for the defendant Town, including Hand High School with its gym. Dahlberg continued in that position even after Exhibit VV. Dahlberg and Williams both knew each other. Williams, who lives in Madison, had done work for the defendant Town on more than one occasion before he put in the replacement floor at Hand in 1991. Williams visited the site during the installation and at one time had two of his own employees with him. At that time he told Dion that he had been hired by the Town and was there to inspect the installation. This was on August 2, 1988 and at that time he told Dion that the Dion was doing a good job CT Page 10099 (Dion noted this on his documentation on Exhibit I which he sent to the manufacturer after completing the installation). Williams also told Dahlberg that he thought Dion was doing a good job although Williams, did, on his cross-examination at trial, indicated that he only gave the job a "cursory glance" This was despite his deposition testimony to the effect that he had told Dahlberg that the floor was being apparently put in correctly.
Dahlberg also had viewed the floor during the installation. Dahlberg also attended a number of the Building Committee meetings, a number of Job Committee Meetings, had spoken to Johannes (the Town's wood floor expert) and also had engaged in correspondence concerning the installation itself and later made observations concerning temperature and humidity in the gym. There were a number of relevant issues that Dahlberg could very have illuminated. Some included: that, given the absence of Miner's "records", there was evidence that if anyone else had recordings or information of the temperature and humidity in this gym at relevant times it was probably Dahlberg. The Building Committee meeting minutes of May 1, 1989 state that "John Dahlberg brought material to show exactly how the floor was laid. He demonstrated using the material for our gym floor, then with another system. His contact from town said it wasn't drawn together enough and therefore the clips are not holding." Further, on June 29, 1989 Dahlberg wrote Murphy saying "We need to discuss the humidity and ventilation of the new gym now that school is out. As you are aware, we were told the problem with the gym was because we did not keep the proper humidity in this area. However, as you know the gym has not been engineered or designed for keeping the temperature, humidity or ventilation constant in the new gym. Would you please have the architect and engineer, Kosinski and T.T. Engineering Company, get together and provide appropriate recommendation for us concerning this problem. Since the Building Committee and the architects have all the information regarding this problem we need your assistance and guidance. . . ." The minutes of the Building Committee of July 10, 1989 (at which neither Dahlberg or Johannes are indicated as being present) state in part: "The committee's floor consultant, Mr. Johannes told Fred [Murphy] that if the floor looked in January as it does now, there would have been no reason to refuse it. He said the floor was clearly unsatisfactory. There are several points to make. Humidification brought the floor back. The floor is of course used during the winter months, and if the same thing happens again, it cannot be acceptable. No other high school has had this problem. Connor said there was too much heat int he [in the] gym. John [Dahlberg] clearly denied this. He said it was at 65 degrees CT Page 10100 at the most when the gym was being used. There couldn't have been8-10% humidity moisture content when the floor was laid last August" [cross out in original]. On August 14, 1989 Dahlberg wrote Murphy "Re: DHHS-Operation of Gym Heating Ventilation System" saying "As requested by the floor manufacturer, to keep our guarantee, we must keep the ventilation system operating on a day cycle during the summer. I am only able to do so manually by having the head custodian turn the system on and off each day. This should be done automatically by a day-night automatic pneumatic Honeywell control to avoid someone forgetting to turn the system on and off each day. Please have engineers and Kosinski come up with a solution. . . ." Thereafter, on November 7, 1989, Dahlberg wrote Murphy the following letter:
"The chief custodian has reported to me, on my return to work, that he has noticed for the past two weeks the gym floor showing signs of shrinkage again. As you know, we were accused of not maintaining the proper temperature in this area.
We have had our contractors calibrate and adjust the four old units in the gym. I suggest that the two new units be calibrated and synchronized with the old units. It was observed by Maurice Masse and Ken Borst on November 4, 1989 that one new unit was operating (it should not have been). The temperature reading was not taken at this time. The problem could possibly be that a thermostat is slightly out of calibration. However, as a suggestion, we should keep the gym area at a desired temperature of 65-72 degrees.
Would you please call Prete Construction Company to have the two new units synchronized with the four old units. Until this problem with the gym floor is resolved, I will see that the four old units are kept in calibration with out service contracts. The chief custodian and head custodian have been instructed that they must report any problems in the new gym immediately."
On January 22, 1990, there was a meeting of the Building Committee on the gym floor itself at which, inter alia, were present John Dahlberg and "Bob Williams, John Dahlberg's local consultant" as well as Richard Johannes (the defendant's expert) and the minutes of that meeting include the following: "Johannes indicated that one problem may be that the floor is 27/32. Should we replace would be better to go with 31/32 stock. Would have been about $3,000.00 more. Would have been a better floor and less susceptible to problems. However going to abetter stock may cause CT Page 10101 problems with the litigation. "Johannes testified at trial that Dahlberg was the one who described the "ventilation" system in the gym and gave him the information on that. It also cannot be overlooked that Dahlberg was aware also from the Connor Care Card (Exhibit K) that proper care of this floor "requires" certain temperature and humidity levels (especially during the heating season) as well as proper ventilation.
Our references above to Dahlberg, it is submitted, demonstrate that his evidence could be quite relevant not only as to the circumstances surrounding the actual installation in 1988 but also the circumstances surrounding the environmental conditions extant in the gym from that time until the Dion floor was taken up in March 1991. He could also have testified about the condition of the floor itself during that period. In our view, any genuine attempt to decide the Town's part in endeavoring to maintain reasonably proper atmospheric conditions in the Hand gym during the Dion floor installation as well as thereafter up to March 1991 cannot be done without the testimony of John Dahlberg. There is no question that John Dahlberg was "available" during the trial; he was actually sitting in court on more than occasion. See Secondinov. New Haven Co., supra. It is true that Dahlberg was available to both parties. He was, however, a person who stood in such a relationship to the defendant and/or to the issues that the defendant would naturally be expected to have produced him if his testimony was favorable to the defendant, and, therefore, underSecondino, there is a proper basis upon which to show an unfavorable inference and one is so drawn as to John Dahlberg.Secondino v. New Haven Gas Co., supra, 675, 676.
Richard Johannes of New York City was the defendant's wood flooring expert. He had been in the wood flooring installation business for many years, having dealt with gym and athletic floor surfaces, sport courts, dance floor systems and residence tile flooring. He was familiar with clip and channel systems of various manufactures including Connor. He, however, was not a licensed Connor installer and ha [had] installed only one gym floor in Connecticut and that was in the Stamford YMCA. Johannes has installed over the last twenty years three or four Connor floor systems but he has "patched" or repaired one or two Connor floors. He has installed only one 27/32" Connorloc floor system and that was in New York City. He has, however, put in many wood floor systems of 33/32" thickness.
The first time that Johannes actually saw the gym floor at CT Page 10102 Hand was on June 20, 1989, about ten months after Dion had installed it and that date was also after the first heating season was over. His report of June 23, 1989 to the Building Committee said there was evidence of "shrinkage throughout the floor area", some floor boards "have distorted and twisted producing an uneven separation in the flooring and this is evidence of excessive dimensional change in the flooring boards." He also said in that report that there was evidence of the flooring "being loose, particularly under the basketball backstops and high traffic areas", that "in some areas the butt ends of the flooring have pulled apart" and that "A general squeaking in varying degrees occurs throughout the floor areas." Insofar as background given him prior to this inspection this portion of the report states mainly in hearsay: "Information provided to me revealed that during the heating season this shrinkage to the gymnasium floor was quite excessive in many areas, exceeding 1/4", producing a loose floor. As my inspection took place in June 1989, it was brought to my attention that a great amount of shrinkage cracks has closed due to the wet and humid weather experienced during the last month." That report then said "It is my opinion that, based on the above, [as this has just been set out in this memorandum] the floor was installed under high-moisture conditions and there is no guarantee that the excessive shrinkage will not take place again when the heat is turned on."
Several observations are in order here concerning Johannes' inspection of June 20, 1989. It is not at all clear on the evidence as to what "information was provided to me [Johannes] about the Dion installation or about the prior heating season and who provided it. We know Johannes testified Dahlberg gave him information, the extent of it we do not know. We know, if we accept the defendant's evidence, that it took no readings of either of temperature or humidity. Johannes himself testified that in the ordinary temperature cycle he would expect the floor to expand and contract until it stabilizes. There is no evidence that Johannes did or did not use relevant weather or NOAA data. Despite Johannes' critique of the condition of the floor no photos were produced by him at all of anything he saw on his inspections. Neither the architect or any of his representatives were with Johannes when he made his first inspection on June 20, 1989 although there was a job meeting shortly thereafter on June 23, 1989 at which Murphy, Dahlberg, Neil Prete, Stafford (manufacturer's representative) Berk, Dion and Shoemaker (the architect's representative) were present. Concerning the statement in his report that . . . it was brought to my attention that a great CT Page 10103 amount of shrinkage cracks has closed due to the wet and humid weather during the last month. . . ." there is no evidence not only of the source of that information, but there is also no evidence that during the past month the weather had in fact been "wet and humid". Moreover, there were not any sketches or drawings made by him. At the trial Johannes did say that he took moisture readings for the two days (June 1989 and January 1989) of his inspections but that he did not have therewith him in court. An interesting observation about his June 20, 1989 report is found in the BC Committee minutes of July 24, 1989 where those minutes state "Johannes said when he was here that just by looking at it [the gym floor] you can tell the lumber was too wet when installed. But this statement was not included in his report. . . ." Despite some testimony by him to the contrary, his June 1989 report does not recommend the replacement of the floor. Rather, that report states that "[If]** a decision is made to replace the floor the following are my recommendations. . . ." Johannes suggested and Building Committee agreed that he return thereafter during the heating season and examine the floor again.
In any event Johannes did return and inspected the floor or January 22, 1990. His report of this on January 29, 1990 said that "the wood flooring in the gymnasium has shrunk to a greater degree . . ." than on his earlier inspection, that "in many areas the wood flooring boards have shrunk to a point producing side and full cracks, varying from 3/16" to 1/4"" and that "where this shrinkage occurs, it has caused the holding clips to come loose, cause squeaks and loose boards" and he called particular attention "to areas under the basketball backstops where the boards have become very loose." It also states that moisture tests were made to the wood floor in approximately 16 locations "indicating an average moisture content of 6 — 6-1/2" which is, he stated "an expected moisture for the Northeast area during the heating season." He repeats that it is his opinion "that the flooring was installed (Summer/Fall 1988) with a high moisture content and when exposed to permanent heat, the wood flooring shrunk, causing these cracks and loose conditions." Again he made no recommendation that the floor be replaced but used the same language i.e. "[If]** a decision is made to replace the floor, the following are my recommendations, as pointed out in our report of June 1989." One of these recommendations (also made in his earlier report) was 4". Replace the maple flooring with new flooring to match the thickness and grade of the existing maple. . . ." This recommendation was not ultimately followed as the replacement floor was thicker, i.e. 27/32". CT Page 10104
Several observations are in order concerning this inspection which was the last time Johannes inspected the floor before its removal commenced. The BC Committee minutes of January 22, 1990 show that there was a meeting on the gym floor "this morning" of a number of people including Fred Murphy, Ken Borst, Richard Johannes "(committee's wood floor expert)", Bob Williams "(John Dahlberg's local consultant)" and John Dahlberg. Significantly, neither the architect Kosinski or anyone from his office are shown as being present. The minutes go on and state: "Richard Johannes reiterated what he said last June. Namely, the wood was wet when it was installed; therefore wood will swell — in summer and wide [sic] open in winter. Connor recommended two coats of sealer in August. Johannes said didn't think would work, but if we didn't try it, it would be difficult litigation. However, he suggested that we reserve the right to reject or accept the floor in January. This morning he said that this floor would never be any better than it is right now. His expert opinion is that we have to go to litigation." Actually, the coats of the resealing had been done in August 1989 after Johannes first inspection and before his second one. Johannes testified at the trial that he did not recollect being consulted about the resealing. Again no temperature readings were taken nor were any photos taken or sketches made. No moisture readings were taken by the defendant between the times of Johannes' inspections, i.e. June 1989 and January 1990. These minutes also state that "Johannes indicated that one [sic] problem may be that the floor is 27/32. Should we replace would be better to go with 31/32 stock. Would have been about $3,000.00 more. Would have been a better floor and less susceptible to problems. However going to a better stock may cause additional problems with the litigation." Putting any litigation milieu of these minutes aside, it is deemed significant that neither the architect Kosinski or any architect from his office are shown as being present at this meeting. This is especially so because of the responsibility and authority of the architect as to the conformance of work to the contract documents. This last observation plays directly into the approval by the architect, Howard Shoemaker (of Kosinski's office) on February 6, 1990 of Prete's January 15, 1990 application for payment under Exhibits D and E. Shoemaker testified that he approved these applications noting that when he did so on February 2, 1990 that the floor had been used for one full basketball season in 1988-1989 and that a second such season was in progress. Shoemaker, Kosinski's representative had seen the floor he estimated on "maybe ten site visits" between September 1988 and February 6, 1990. When he refused to sign Exhibit VV in June 1990 CT Page 10105 at Kosinski's request, he said that he had inspected the floor in the summer of 1989 and that "it did not appear too bad then."
We find that Johannes was not at all a persuasive witness, particularly as to the opinions he ventured concerning the Dion floor. Prior to March 1991 Johannes was not even aware of the degree of availability of the Dion floor for use in the Hand gym. We are aware that an expert draws on various sources of information whose trustworthiness he must decide based on his expertise. We recognize as well that it would almost totally nullify the use of such witnesses if it was required that they substantiate every single element of their ultimate opinion on the basis of first hand knowledge or their own personal experience. Where some of an expert's information comes from sources fairly trustworthy even though hearsay and he possesses the ability to collate and evaluate it with other facts he has or knows through personal knowledge the weight and credibility of that is for the trier of fact to evaluate. As to Johannes, however, the information "brought to my attention . . ." that was provided to him, even if hearsay, we do not know the source nor the extent. We do not know what information (or its source) that led him to say that the floor was installed under high moisture conditions. . . ." Yes, there was much evidence about moisture in the case, but the point is what did he know of it when he rendered his opinions at the time of his two inspections. Connor representatives, including Ron Davidson, had met at the Hand gym with Shoemaker and others on March 30, 1989 which was between Johannes' two inspections. Davidson, on April 3, 1989, wrote to Shoemaker, not only referring to the Connor Care Card directions but in doing so said that "what we observed on March 30, 1989 was a situation where the floor has literally been baked by the heat in the building. . . ." Parenthetically, we note that Prete, Dahlberg and Kosinski were all copied with this "literally baked" letter. Johannes who said Dahlberg had given him information about the "ventilation" in the gym, did not address in a credible manner the effect of excessive heat referred to in Davidson letter assuming that he was even given it or made aware of this information. Yes, he made observations during his inspections and the floor was not perfect. But he did not take one single photo or produce any sketch of any of the problems. This is in stark contrast to the heavily documented and heavily photographed floor removal and floor replacement in 1991 when Bob Williams' company put in the new floor.[1]
Before we resolve the issue of the materiality of any breach by the plaintiff of its June 1987 contract with the defendants, we CT Page 10106 take up the matter of the building Committee's decision to replace the entire Dion installed floor. The decision to remove the Dion floor in its entirety and to replace it with entirely new floor was, under all the evidence, unreasonable and unwarranted under all the circumstances. On April 9, 1990 the Building Committee (with Peter Kosinski present) unanimously voted "to commence action to replace the floor" and Kenneth Borst of that Committee" asked that Kosinski provide us with specifications." Interestingly, the minutes of that meeting also state "Discussion of when we should attempt to redo the floor and the problems of having to do it in August. A new contractor would probably want to install under optimum conditions. We will ask the school if they would work with us, possibly for October." On May 5, 1990 defendant's counsel wrote Prete maintaining that Prete's "corrective attempts were unsuccessful" was well as stating that "the [Building] Committee has been advised and agreed, and the Architect concurs, that the [entire]** floor must be replaced and refinished." We have earlier discussed Prete's response letter of May 17, 1990 including its' reference to the fact that it had never been informed by the architect pursuant to the Contract Documents that the gym floor had not been installed in accordance with the specifications or that it was defective. It acknowledged that "the only person from which we have received any claim that the floor is defective in some way is Mr. Murphy" and that his claim "has never been supported by any professional opinion or written opinion from the architect." It further said that "We will not even consider the matter until such backup documentation and opinion is supplied." Prete was correct, it had not been given the opinion referred to and it was fair of it to take the position it did in that letter. There was no credible evidence to indicate that at that time Prete was aware that earlier Kosinski had been asked to provide the Building Committee with specifications for the replacement floor. The Building Committee minutes of May 14, 1990 state in part that "Ken [Borst] will call Kosinski and get them started on doing specs for new floor." All this is well after
Kosinski's architects had signed and approved Prete's applications for payment for the gym floor in Exhibits C, D and E. All this isbefore it was decided that Prete be contacted by the architect Kosinski who ultimately wrote the floor is "unacceptable" letter of June 19, 1990. This is no indication in that letter of the manner in which or documentation of the basis of the architect's opinion of why "the floor does not meet the quality standards specified within the contract documents." This too is all after the Dion floor had been used, as already set out, and had the benefit of it since late 1988. This is all long after the Building Committee CT Page 10107 minutes note a comment from the Chair to the architect Shoemaker "that the specs say things that may be a difficulty. There are contradicting statements . . ." and the architect "concurred and will look into." There was also evidence that the extent of whatever could properly be found to be defective and/or "unacceptable" comprised an area of the floor that was quite modest in degree and evidence that part either was in fact repaired, i.e. "dead spots" or "loose boards" could have been repaired, all of which contributed the lack of any reasonable necessity of replacing theentire floor. As well as giving the Town the Connor Care Card. Connor, of course, had inspected and approved the floor. The Building Committee had determined that the entire floor had to be replaced and that was not a reasonable determination to do so. It was entirely replaced by Robert Williams of New England Overland Inc. who used the thicker floor lumber, i.e. 33/32" throughout and whose credible testimony clearly showed that he would not use the 27/32" lumber that the Dion floor did. The specifications for the replacement floor envisioned that wood floor to be 33/32" thickness and the bidding procedure for that floor contemplated the thicker floor.
At this point we decide whether or not under all the circumstances the plaintiff Prete has proven that it is entitled to recover against the defendant on its contract with it of June 19, 1987. We conclude that it has discharged its burden of proof on its complaint and is entitled to recover on it. Implicit in conclusion is that the defendant has not sustained its burden of proof on any one of its special defenses. The first special defense of "payment in full . . ." has not been proven. The second special defense, which contains a number of the operative allegations of the defendant's counterclaim has not been proven. The third special defense has also not been proven. Our conclusion as to the second special defenses in a sense presages our conclusion below as to the defendant's counterclaim upon which we conclude that the defendant has not sustained its burden of proof.
In determining that the plaintiff is entitled to recover on its complaint, we do not maintain that it carried out its contract with the defendant Town as to the gym floor to the letter. There were omissions or deviations in its performance and we deem it fair to say that in a building contract case an accumulation of omissions or deviations, which standing alone, would not spell out a material breach of contract could, taken together, do so. We have endeavored throughout to indicate the complexity of the matter of the installing and maintaining of this floor from the Dion CT Page 10108 installation through the time of the Kosinski "unacceptable" letter of June 19, 1990. We have chronicled the interaction of the plaintiff and the defendant over the state of this floor as well as that of their representatives and/or associates as well as to weigh and sort out the evidence, both testimonial and by exhibit, that is deemed credible. We have discussed the tardy conveying to the plaintiff by the Building Committee by its architect that the Dion floor was "unacceptable". We note, inter alia, the degree of the hands-on attention by the Town to the Dion installation and subsequent maintenance of the gym floor vis-a-vis its intense hands-on attention to the removal of the Dion floor and the installation of the replacement floor by Williams. We have had to sort out the credible from the incredible.
After weighing all the evidence, we find some omissions or deviations in Prete's performance. But putting it all together we do not conclude that, after looking to the multi-factor standards for materiality of breach contained in the Restatement (Second) of Contracts § 241 (1981), see Bernstein v. Nemeyer, 213 Conn. 665, 672
(1990), that there is the requisite materiality to find that the plaintiff was in breach of its contract as claimed.
Our application of the five Restatement Second § 241 factors leads us to the conclusion that any omission or deviation by Prete singly or collectively, did not constitute material breach of this contract. We will not go over all we have said. First, as to the extent to which the defendant was deprived of the benefit which it reasonably expected we have already pointed at length that the defendant never, over the entire time the Dion floor was in place, had to cancel or interrupt a basketball game on that gym floor. Moreover, that gym floor was as we have also pointed out, used for a number of other school activities. Here we do not overlook the circumstance that the defendant, on entering into the 1987 contract with the plaintiff, can be said to have reasonably expected to have had the benefit of that gym floor beyond March 1991 when it removed the entire floor and totally replaced it with the one installed by Robert Williams of New England Overland Corporation. However, as we have concluded earlier it was unreasonable and was in the nature of economic waste for the defendant to have done that. Parenthetically, there is no evidence that anyone was ever injured using the Dion installed floor. Second, we look at the factor of "the extent to which the defendant can be adequately compensated for the part of the benefit of which he will be deprived". Here we have concluded that the Building Committee had decided that it was going to have a totally new floor even before it actually knew the state CT Page 10109 of the entire floor and when this gym floor had been in continuous use. It cannot be found that any injury the Town might have suffered by any "breach" could not have been adequately compensated for in damages. The scenario here was far from that of a floor that was totally inadequate for the use intended which is just how the defendant treated it by totally tearing it up and totally replacing it. We can and do, on the law and the facts conclude that it was so far removed from being "unacceptable" that the plaintiff's contract, insofar as the gym floor was concerned, was substantially performed and that Exhibits C, D and E (all approved by the defendant owner's architectural representatives) are to be paid by the Town in the manner hereinafter set out. Deficient workmanship, it has been held, may constitute the difference between substantial and full performance, but it is not necessarily a bar to recovery on the contract. Gosslein v. Better Homes, Inc.256 A.2d 629, 640 (Me.) (express contract involved). Gray v.Weiss, 519 A.2d 716, 717 (Me. 1985); See Combustion EngineeringInc. v. Miller Hydro Group, 812 F. Sup. 260, 263 (Me. 1992); Third, looking at the factor of "the extent to which the party failing to perform or to offer to perform will suffer forfeiture" the plaintiff will suffer a substantial forfeiture if the contract was found to have been materially breached. At trial the parties stipulated that if the plaintiff prevailed on its complaint it was entitled to $125,706.55 in damages. This sum for the work and materials that went into the gym floor is substantial. It is also, in effect, the sum for which the defendant's architects have approved payment to the plaintiff in Exhibits C, D and E. It is for the installation of a floor affixed to the defendant owner's realty representing performance by the plaintiff that is hardly easily salvageable. The benefit conferred upon the defendant of which it had the use certainly is not something that can be returned to the plaintiff in specie. It is plain here that if forfeiture is suffered by the plaintiff its extent will be very considerable in degree as well as amount. Here we also refer to the matter of the likelihood that the party failing to perform (here the plaintiff) or to offer to perform will cure its failure, "taking account of all the circumstances including any reasonable assurances." We will not go over "all the circumstances" including those surround the actual installation of the Dion floor as well as what Prete and Dion did thereafter concerning dead sports [spots] and loose boards, Prete's proposal to cut away a portion of the floor for testing, Prete's proposal to bring an expert the Maple Hardwood Floor Association from Chicago to evaluate the situation, the lack of any opinion from the defendant's architect given to the plaintiff in conformance with the contract documents until long CT Page 10110 after the floor was installed, as well as the unjustified removal of the entire floor Dion installed as well as others. We have had occasion to indicate the view of the Building Committee before it had decided to follow the contract documents in giving Prete notice of the alleged defectiveness of the floor installation when it did so by Kosinski's "unacceptable" letter of June 19, 1990. That it was determined to replace the floor even before that is strongly suggested by that Committee's minutes of the meetings of April 9, 1990 and May 14, 1990. In the former the Committee voted unanimously to replace the floor and Kenneth Borst asked Peter Kosinski (who was present) "to provide us with specifications." The May 14, 1990 minutes also reveal that "Ken [Borst] will call Kosinski and get them started on doing specs for the new floor." We cannot say that taking account of all the circumstances that any failure to perform and/or cure is to be resolved against the plaintiff. Moreover, we do not overlook in the mix to be considered that a breach is more likely to be treated as material where the failure to perform or tender by the plaintiff (in this case) ". . . has relied substantially on the expectation of the exchange, as through preparation or performance" whereas such a failure ". . . is less likely to be regarded as material if it occurs late, after substantial preparation or performance. . . ." Restatement (Second) Contracts § 241, comment d. However, to the extent that the expectation of performance by the "non-offending party (here the defendant) is already reasonably secure, in spite of the failure [here of the plaintiff] there is less reason to conclude that the failure is material." See Restatement (Second) Contracts § 241, comment E. Here the defendant had the floor, it had the use and benefit of it for the purposes and time all as outlined above. It is submitted that if the Town, as it claims did not get the basketball floor it reasonably expected under its contract with Prete, then common sense raises the question of why, during all the time the Dion Floor was in place, was there not as single Hand basketball game cancelled, postponed or called? Even broader than that, how did it also accommodate the other uses we have referred to? Finally, there is the matter of the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing. We conclude that the behavior of the plaintiff comported with the standards of good faith and fair dealing. We also determine that the plaintiff is not guilty of any "wilful" breach. See Vincinziv. Cerro, 186 Conn. 612, 615 (1982). Balancing the application of the multi-factor test of Restatement Second § 241 we conclude that the plaintiff has not materially breached its 1987 contract with the defendant. CT Page 10111
We have already concluded that the plaintiff did not breach its 1987 contract with the defendant. Without reiterating all we have said it is quite clear that, that the defendant received a functional gym floor of which it had the use and benefit for the period and the purposes already stated. This floor which was incorporated into the real property of the defendant by the work and materials of the plaintiff did not work in a real degree any objective frustration of the purpose of its installation. Yes, the defendant Town felt so but we have already resolved that matter against it in the face of circumstances that it had been given this functional gym floor. The defendant's architect had already approved the plaintiff's application for payment in Exhibits C, D and E. Of course, the defendant could nullify or set aside these approvals under the contract documents as it claims it did when their architect Kosinski wrote his "floor is unacceptable" letter to the plaintiff on June 19, 1990. That letter, which was Exhibit VV, did not have that effect under all the circumstances of this case.
That, therefore, means that we can and do conclude that the plaintiff is entitled to recover of the defendant Town the amount of $125,706.55 which is the amount it claims under the first count of its complaint. Nor is there to be any set-off or credit to be given to the defendant against that figure of $125,706.55.
As to the second count the plaintiff has, inter alia, incorporated in it the 1987 written contract between itself and the defendant Town, and has also alleged that it furnished its labor, material and equipment in good faith with the expectation of payment from the Town which, in turn, has wilfully availed itself of the same both by possession and beneficial use, has not paid the plaintiff for them and has, therefore, been unjustly enriched. The plaintiff, accordingly, seeks judgment for the reasonable value thereof plus a reasonable allowance for profit and overhead.
"Parties who have entered into controlling express contracts are bound by such contracts to the exclusion of inconsistent implied contract obligations." H.B. Toms Tree Surgery, Inc. v.Brant, 187 Conn. 343, 346-347 (1982); see Polverari v. Peatt,29 Conn. App. 191, 199 (1992). "Proof of a contract enforceable at law precludes the remedy of unjust enrichment." [citations omitted] Feng v. Dart Hill Realty Inc., 26 Conn. App. 380, 383
(1992). Having decided that the plaintiff has proven that he has a contract enforceable at law, we believe that, in this case, bars CT Page 10112 him from prevailing upon the equitable remedy of unjust enrichment. Therefore, judgment on the second count is entered in favor of the defendant Town.
We now turn to the third count. It essentially alleges that the plaintiff is entitled to recover, on the theory of quantum meruit, the loss to it of the reasonable value of the labor and materials, i.e. $125,706.55, it has suffered because of the defendant Town's wrongful and wilful refusal to pay that amount to the plaintiff for the labor and materials which it has received and used. "Quantum meruit refers to that class of obligations imposed by law, without regard to the intention or assent of the parties bound, for reasons dictated by reason and justice." Carpenter v.Josey Oil Co., 26 F.2d 442, 443-444 (8th Cir. 1928). It means "as much as he deserves" and describes the extent of liability on a contract implied by law. See Black's Law Dictionary (5 ed. 1979) p. 1119. Our Appellate Court has said that "Quantum meruit allows a plaintiff to `recover the benefit conferred on a defendant where no express contract has been entered into. Burns v. Koellmer,
[11 Conn. App. 375, 385 (1987)]'." Rosick v. Equipment Maintenance Services Inc., 33 Conn. App. 25, 36 (1993). An express contract has been entered into in this case and this court has already found for the plaintiff on it. The court, therefore, concludes that a recovery on the theory of quantum meruit is not available to the plaintiff under the circumstances. Accordingly, judgment on the third count of the complaint is entered for the defendant Town.
Finally, the plaintiff seeks an award of prejudgment interest against the defendant Town. The award of prejudgment interest under § 37-3a is an equitable determination that lies within the trial court's discretion. Nor'easter Group Ins. v. ColossaleConcrete Inc., 207 Conn. 468, 482 (1988); Newington v. GeneralSanitation Services Co., 196 Conn. 81, 90 (1985). An allowance of prejudgment interest under § 37-3a turns on whether the detention of the money is or is not wrongful under the circumstances.Associated Catalog Merchandisers Inc. v. Chagnon, 210 Conn. 734,748 (1989); Cecio Bros., Inc. v. Feldman, 161 Conn. 265, 275
(1971); Alderman v. RPM of New Haven, Inc., 20 Conn. App. 566, 569
(1990). Cecio states that "The determination of whether or not interest is to be recognized as a proper element of damage, is one to be made in view of the demands of justice rather than through the application of any arbitrary rule." Cecio Bros., Inc. v.Feldman, supra, 275, in quoting Bernhard v. Rochester German Ins.Co., 79 Conn. 388, 398 (1906). The fact that there existed a legitimate dispute between the parties does not mean that an award CT Page 10113 of prejudgment interest is not appropriate. Harris Colorific SalesCo. v. Manifold Systems, Inc., 18 Conn. App. 559, 566 (1989).
Although the plaintiffs claim interest in its complaint and in its brief it does not develop any persuasive analysis as to why such an award is justified here. This court is aware that where the sum recovered is liquidated "may, of course, be a useful although not necessary controlling criterion", see Bertozzi v.McCarthy, 164 Conn. 463, 466-467 (1973) but is a consideration of an award of prejudgment interest. One court has said that "Interest does not run on liquidated claims as a matter of course but `in accordance with the principles of equity.'" Bak-A-LanCorporation of America v. Alcoa Building Products Inc., 69 N.J. 123,131 (1976). Although Prete's performance was not perfect, it was not such to constitute, as we have already set out, any material breach of its contract, it is, something to be considered on its prayer for prejudgment interest against the defendant municipality. The plaintiff, according to the evidence, was somewhat behind schedule in turning the Dion-installed floor over to the defendant Town for its intended use. The court believes that, in balancing the equities, this is not simply a case of the Town holding back $125,706.55 from the plaintiff and to use it for some non-related municipal purpose. While, as we have said, we did not agree with the Town's removal of the entire Dion-installed floor the Town did expend $125,706.55 and then some for a replacement floor of thicker floor lumber than the original. We note that the plaintiff refused to take back any of the wood from the Dion floor when the Town offered to return it to Prete. It has been said that "An award of prejudgment interest" is, in the first instance, compensatory' but this compensatory principle must be tempered by our assessment of the equities.' Norte Co. v. Huffines,416 F.2d 1189, 1191 (2d Cir. 1969), cert. den. . . . 397 U.S. 989." Securities and Exchange Commission, 638 F. Sup. 638, 640
(S.D. N.Y. 1986). We cannot fairly say the Town wrongfully detained the $125,706.55. Under all the circumstances, including the Town's expenditure for the replacement floor, we conclude that the plaintiff's request for prejudgment interest against the defendant municipality, should be and is denied.
In summary: Judgment is entered for the plaintiff Prete Construction Co. on the first count of the complaint that it recover $125,705.55 in damages against the defendant Town of Madison. Judgment is entered on the second and third counts of the complaint for the defendant Town of Madison. Judgment is entered for the plaintiff Prete Construction Co. on the counterclaim filed CT Page 10114 by the defendant Town. The plaintiff's request for prejudgment interest is denied.
Arthur H. Healey State Trial Referee